Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| S.T., and J.T., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH. <br><br> Defendants. | COMPLAINT <br><br> Case No. 4:21-cv-00021-DN |

Plaintiffs S.T. and J.T., through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company and United Behavioral Health (collectively "United") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. S.T. and J.T. are natural persons residing in Harris County, Texas. S.T. is J.T.'s father.

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the insurer and claims administrator and fiduciary under ERISA for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). S.T. was a participant in the Plan and J.T. was a beneficiary of the Plan at all relevant times.

4. J.T. received medical care and treatment at Ashcreek Ranch Academy ("Ashcreek") from December 7, 2017, to March 11, 2019. Ashcreek is a residential treatment facility located in Washington County, Utah, which provides sub-acute inpatient treatment to adolescent boys with mental health, behavioral, and/or substance abuse problems.

5. United denied claims for payment of J.T.'s medical expenses in connection with his treatment at Ashcreek.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, and the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

## BACKGROUND FACTS

### J.T.'s Developmental History and Medical Background

9. J.T. was adopted by S.T. at birth. J.T. experienced some learning difficulties in elementary school and was diagnosed with ADHD. As he grew older, J.T. struggled to maintain social relationships and had worsening social anxiety. J.T. started seeing a psychiatrist for these issues.

10. J.T. struggled to control his impulses and would often lash out physically and verbally. In April of 2014, this led to him getting into an altercation with another boy at school who J.T. struck on the back of the head hard enough that the boy needed a CT scan. J.T. started refusing to attend school and became increasingly violent and defiant. He broke the doorframe in his bedroom and punched out the window on his front door after getting frustrated with his homework.

11. J.T. was failing multiple classes, he was given a psychiatric evaluation which he initially refused, until S.T. called a constable after J.T. threatened to physically harm him. J.T. started taking a new medication and attending a new school and his behaviors initially improved, however J.T. continued to experience severe social anxiety and would isolate himself in his room.

12. J.T.'s improvement only lasted a short time before he resumed acting out and threatening family members. On one occasion, he punched a hole in the wall because he didn't want to stop playing a video game to go to a dentist appointment, he then held a knife to his throat and threatened to kill himself. The police came to the house and on their recommendation J.T. was taken to a psychiatric hospital. J.T. continued to lash out

physically and make threats, saying things like "if I were angry you'd be dead right now."

13. J.T. stopped taking care of his hygiene and threatened to run away and to commit suicide. J.T. was emotionally manipulative and threatened to harm himself if his girlfriend broke up with him. J.T. had panic attacks and continued to destroy property and threaten his parents. He started dating another girl online and entered into a suicide pact with her. J.T. started refusing to go to school and his psychiatrist recommended that S.T. contact an educational consultant to find an appropriate placement for J.T.

14. J.T. was admitted to an inpatient outdoor behavioral health treatment program called Elements where he stayed for ten weeks. J.T.'s treatment team at Elements recommended that he receive residential treatment care following his discharge.

**Ashcreek**

15. J.T. was admitted to Ashcreek on December 7, 2017.

16. In a letter dated December 18, 2017, United denied payment for J.T.'s treatment. The letter stated in part:

> Your child admitted [sic] for treatment of a mood and anxiety disorder. After reviewing the case notes, it is noted that your child's condition does not meet Guidelines for coverage of treatment in this setting. Your child is not experiencing any mood symptoms that require 24 hour monitoring. He is cooperative with the treatment. He has a supportive family. His mood and anxiety symptoms can be addressed in a less restrictive environment. Your child could continue care in the mental health partial hospitalization setting.

This letter was not initially provided to the Plaintiffs.

17. On November 12, 2019, S.T. submitted a level one appeal of the denial of payment for Ashcreek. S.T. stated that he had received a variety of Explanation of Benefits ("EOB") statements with multiple justifications for the denial. The EOB's denied payment on the

grounds that the claim wasn't timely filed, prior authorization was not obtained, because the service billed did not match the authorization requested, because J.T. had allegedly not made measurable progress toward treatment goals, and because insufficient records had been provided.

18. S.T. reminded United of its obligations under ERISA, including its responsibility of taking into account all of the information he provided, using appropriately qualified reviewers with specializations in J.T.'s diagnoses, providing him with the information he required to perfect the claim, acting in his best interests, and performing a full, fair, and thorough review of the denial.

19. S.T. contended that he had submitted his claims in a timely manner according to the terms of the Plan. He argued that a preauthorization denial was not appropriate because Ashcreek had attempted to obtain prior authorization for the care J.T. received, and that in any event the Plan allowed for a retrospective review of claim denials. S.T. requested that United perform a retrospective review.

20. S.T. contended that some of the EOB's misclassified the level of care as outpatient treatment even though the treatment was billed at the residential level of care. S.T. asked United to correct the error.

21. S.T. questioned how United could deny payment due to J.T. ostensibly not making progress in treatment, while simultaneously claiming that it did not possess sufficient medical records or clinical information to evaluate the claim. S.T. included a copy of J.T.'s medical records with the appeal and contended that it was clear from these records that J.T. required the treatment he was receiving.

22. S.T. pointed out that while United had denied payment partially due to an alleged lack of progress, it had not denied payment because J.T. made *no* progress, but instead S.T. wrote that United had denied payment because J.T. "had not made sufficient progress within an arbitrarily predetermined time frame."

23. S.T. contended that requiring improvement in this manner constituted a nonquantitative treatment limitation in violation of MHPAEA. S.T. requested that United "conduct a formal parity analysis" of the Plan and to provide him with the results of this analysis.

24. In a letter dated January 17, 2020, United upheld the denial of payment for J.T.'s treatment at Ashcreek from December 7, 2017, through December 12, 2017. The letter gave the following justification for the denial:

> …You were admitted for treatment of depression and anxiety. After reviewing the medical records, you did not need the type of care provided in this setting. You were medically stable. You were not having thoughts to harm yourself or others. You were able to participate in your treatment. You took your medications. You maintained good control. You had family support. There was no other clinical information provided to support the medical necessity for mental health treatment in a 24 hour/day residential treatment setting. …

25. United sent a second letter also dated January 17, 2020, which stated that S.T.'s appeal for dates of service from December 13, 2017, through March 11, 2019, would not be processed, as the 180 day window for timely filing of an appeal had lapsed. United stated that it needed to receive an appeal within 180 days of its December 18, 2017, denial letter.

26. On February 27, 2020, S.T. filed a member complaint with the Texas Department of Insurance ("TDI"). S.T. alleged that United had not properly processed his claims. He wrote that United had divided J.T.'s claims into two dates of service and denied each for different reasons.

27. He noted that the bulk of the claims, from December 13, 2017, through March 11, 2019, had been denied due to an alleged lack of timely filing. S.T. contended that according to the terms of the Plan, he had 180 days from the date of receipt of the denial to appeal any adverse determination. He wrote that he had not received any denial letter until August 27, 2019, as evidenced by the fax information line on top of each page of the denial letter, and consequently his appeal was timely based on when he was made aware of the denial.

28. He stated that the remainder of the claims, from December 7, 2017, through December 12, 2017, were denied due to an alleged lack of medical necessity. S.T. claimed that United's decision to offer multiple denials for J.T.'s uninterrupted treatment was disturbing, unnecessarily complicated the appeals process, and appeared to violate the terms of the Plan.

29. S.T. contended that he had not been provided with the documentation he requested, that United had utilized unqualified or underqualified reviewers, and that United had made it more difficult for him to effectively appeal the denial by splitting up the dates of service.

30. S.T. asserted that United was mandating that J.T. satisfy requirements which were inconsistent with the level of care he received. S.T. contended that it was not only inappropriate but also contrary to the purpose of residential treatment to make the approval of treatment contingent on acute factors such as "[y]ou were not having thoughts to harm yourself or others."

31. S.T. referenced a recent class action lawsuit, *Wit et al., v United Behavioral Health,* wherein United's guidelines were found to deviate from generally accepted standards of medical practice by, among other things, not taking into account a patient's underlying conditions, artificially limiting the length of treatment through the use of mandatory

prerequisites, and funneling insureds towards a lower level of care even when less intensive treatment was likely to be ineffective.

32. S.T. contended that while United had outwardly modified its guidelines following the decision in *Wit*, it had not modified its internal practices or procedures and it continued to take impermissible actions such as denying payment for sub-acute treatment because of a failure to meet acute level requirements. John asked TDI to take action against United and require United to correct the errors it had made during the appeals process.

33. On March 24, 2020, United sent a corrected version of the January 17, 2020, letter.[1] The corrected letter appears to have omitted some information from the initial letter such as the identity of the reviewer, but it did include items such as a form to request an external review which was absent from the initial letter.

34. In a letter dated March 31, 2020, United responded to the complaint filed with TDI. United stated that its own review had failed to find any fault with how the appeal decisions had been handled, but it stated that because S.T. claimed he had not received a denial letter until August of 2019, "UBH will grant a one-time exception in good faith and waive timely filing based on your report of not receiving the determination letter until August 27, 2019."

35. United also included a statement on its handling of MHPAEA and wrote in part:

> Please also note that the requirement of MHPAEA is that benefits must be comparable to, and applied no more stringently for mental health and substance use benefits, as it is for medical/surgical benefits under the plan. In this case, the plan requires covered health services be subjected to prior authorization and medical necessity as set forth in the Insperity Holdings, Inc. Summary Plan Description. This requirement applies to both medical/surgical benefits and mental health/substance abuse disorder benefits and is therefore comparable.

---

[1] The corrected letter was a revised version of the January 17, 2020, denial for lack of medical necessity, not the denial bearing the same date which alleged a lack of timely filing.

36. While this assertion states that United does not have stricter standards for preauthorization between its medical/surgical and mental health services, S.T. did not, nor does he now, allege that United violated MHPAEA through a disparity in preauthorization. Rather, S.T. alleges that United relied on other factors such as restricting the availability of sub-acute care through the use of acute level requirements and in this manner violated MHPAEA.

37. In a letter dated June 23, 2020, TDI responded to S.T.'s complaint. TDI apologized for the delay in its response and included a summary of the responses it had received from United to the complaint allegations. TDI stated that it could not compel United to provide payment as it, "does not have regulatory authority over the appeal process nor can we make medical decisions to resolve disputes between the patient, the doctor and the company." The letter also diagrammed the actions taken by TDI to resolve the complaint.

38. In the letter from TDI, United's stated that its reviewer attempted to contact Ashcreek on December 18, 2017, to discuss authorization, but after failing to get in touch with the Ashcreek representative, United decided to deny care that same day due to:

> He is not reporting any passive or fleeting thoughts of suicide. He is not psychotic. He appears cooperative and is adjusting to the program. The member does not appear to require 24hour [sic] monitoring while undergoing treatment for his mood and anxiety. He has a supportive family and can continue his care in a less restrictive environment.

39. The letter stated that J.T.'s care was then authorized at the partial hospitalization care, then the intensive outpatient level of care, and then denied entirely because "the claim did not match the level of care authorized." United then revealed it had split the claim into two date ranges as Ashcreek had not requested authorization until December 13, 2017.

40. The letter stated that S.T. had been notified of the denial on December 18, 2017, and the August 27, 2019, date stamp at the top was the date that United faxed a duplicate copy to S.T. United contended it had provided S.T. with the documents he had requested, that it was not required to have appeals reviewed by a child psychiatrist, and that S.T.'s argument regarding acute criteria should be dismissed as the treatment had been evaluated based on the Optum Mental Health Residential Rehabilitation Criteria which was "consistent with the level of care" J.T. received.

41. The letter further stated that the decision to deny payment for dates of service between December 7, 2017, through December 12, 2017, was based on Optum's criteria, while the treatment provided after those dates was not processed "based on the guidelines of the member's benefit plan, which requires appeal requests to be submitted to us within 180 days after receipt of a denial of a preservice request for Benefits, or claim denial."[2]

42. The letter also included a copy of United's internal notes regarding the claim. These notes show that United partially denied payment due to factors which were not disclosed to the Plaintiffs, such as the opinion of one of United's reviewers that Ashcreek was more consistent with a therapeutic boarding school than a residential treatment center.[3]

43. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

44. The denial of benefits for J.T.'s treatment was a breach of contract and caused S.T. to incur medical expenses that should have been paid by the Plan in an amount totaling over $150,000.

---

[2] While it is true that United had processed the claims in this manner up to this point, in its March 31, 2020, letter United waived the timely filing requirement, leaving the medical necessity of J.T.'s treatment as the primary justification for the denial.
[3] As discussed on page 24 of a document titled BH Case Notes for Case ID# FYCCBFY9

# FIRST CAUSE OF ACTION

## (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

45. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

46. United and the Plan failed to provide coverage for J.T.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

47. United's internal notes disclose that it relied on factors outside of its own criteria or the terms of the Plan contract to evaluate J.T.'s treatment. Many of United's justifications for denying care were not communicated to the Plaintiffs, and they were not made aware of them until United released its notes following a TDI complaint.

48. In his level one appeal, S.T. outlined his ERISA rights and quoted the following provision from the statute:

> The notification shall set forth, in a manner calculated to be understood by the claimant-
> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such information is necessary.

United's internal notes show that it relied upon factors such as a requirement that J.T. exhibit acute symptoms for his residential treatment to be approved, but it did not communicate these requirements to the Plaintiffs in its denial letters, and likely would not

have provided this information to the Plaintiffs at all without the intervention of the TDI.

49. As the Plaintiffs were never made aware of United's full justification for denying payment, they would have been unable to fully perfect the claim even if they had addressed all of the arguments United raised in its denial letter to United's satisfaction.

50. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

51. United and the agents of the Plan breached their fiduciary duties to J.T. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.T.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, and to provide a full and fair review of J.T.'s claims.

52. The actions of United and the Plan in failing to provide coverage for J.T.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

53. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

54. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

55. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

56. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

57. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

58. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for J.T.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing acute care requirements for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

59. In its review of J.T.'s claims, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that J.T. received. United's

improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "[y]ou were not having thoughts to harm yourself or others." This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that J.T. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

60. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

61. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice to evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

62. In addition to the acute language mentioned in its denial letters, in its response to the complaint filed with TDI, United released copies of several of its internal notes regarding the evaluation of J.T.'s treatment. These documents reveal numerous MHPAEA violations which were not otherwise disclosed to the Plaintiffs. For instance, on page 39 of a document titled BH Case Notes for Case ID# FYCCBFY9 the reviewer found that "The patient is not exhibiting psychiatric, substance abuse, or medical symptoms that require the 24 hour acute inpatient level of care."

63. The Plaintiffs do not seek payment for benefits at the acute inpatient level of care, nor did J.T. receive such treatment at Ashcreek. However, United's own internal notes show that it continued to evaluate J.T.'s treatment using criteria that United itself referred to as acute.

64. Moreover, while United repeatedly and explicitly used the word "acute" in its own internal documentation, the denial letters sent to the Plaintiffs do not use the word acute. S.T. accused United of having given the appearance of changing its guidelines following the decision in *Wit* but making little to no actual change in operation. United's own internal notes, which were only provided to the Plaintiffs following intervention from TDI, lend support to this allegation.

65. United's internal notes further outline requirements of "acute substance use issues," "acute aggression," or "an imminent risk of harm to yourself or others." United does not require individuals receiving treatment in sub-acute medical or surgical settings to be in acute distress in order to qualify for a non-acute level of care.

66. The language appearing in United's internal notes are also not requirements listed for residential treatment in the Optum Level of Care Guidelines ("the Guidelines") on which United purported to rely. United sent a copy of the Guidelines to the Plaintiffs following the TDI complaint. The Guidelines contain a section concerning residential treatment care and while this section does contain some requirements such as a prohibition of "custodial care" and a requirement that a psychiatrist examines the patient shortly after admission, the Guidelines do not mandate that a patient receiving residential treatment care be experiencing acute level symptoms for care to be approved.

67. Acute care requirements for residential treatment are similarly absent in the summary plan description, even though this document does explicitly mention other requirements for residential treatment such as proper accreditation, the active direction and participation of a physician, and operating according to state law. United evaluated the medical necessity of J.T.'s treatment using requirements that were significantly more onerous than those contained in the Plan or its own guidelines.

68. As another example of the Plan's improper application of its criteria to evaluate the treatment J.T. received, the Defendants relied on assertions such as "[y]ou were able to participate in your treatment" as a justification to deny treatment. In fact, without active participation in treatment an individual cannot be effectively treated in a non-acute residential setting.

69. United also denied payment due to factors such as an alleged lack of progress toward treatment goals. S.T. objected to this on the grounds that United could not arbitrarily define what constituted progress or pick and choose how much time J.T. actually had to make progress. As with S.T.'s call for a parity analysis and many of S.T.'s other arguments concerning MHPAEA, United failed or refused to respond.

70. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. United and the Plan evaluated J.T.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

71. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

72. The violations of MHPAEA by United and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendants violate MHPAEA;

   (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

   (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

   (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

73. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for J.T.'s medically necessary treatment at Ashcreek under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 16th day of February, 2021.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Harris County, Texas