This is a redacted version of a Memorandum Decision and Order filed December 21, 2023.

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| S.T., and J.T.,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE and UNITED BEHAVIORAL HEALTH,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER  GRANTING AND DENYING IN PART MOTIONS TO DISMISS**<br><br>Case No. 4:21-CV-00021-DN-PK<br><br>District Judge David Nuffer |

This administrative appeal of United Healthcare Insurance and United Behavioral Health's (collectively "United") denial of benefits for Plaintiffs S.T. and J.T. is governed by the Employee Retirement Income Security Act of 1974  ("ERISA"). Plaintiffs sued United after J.T.'s claim for residential treatment for his mental health was denied by United. Plaintiffs assert two causes of action against United: (1) failing to provide coverage for medically necessary treatment in violation of the terms of the Plan and 29 U.S.C. §1132(a)(1)(B);[1] and (2) violating the Mental Health Parity and Addiction Equity Act ("Parity Act").[2] Plaintiffs and United filed cross motions for summary judgment.[3] Each party opposes the other's motion and filed a reply in support of its own motion.[4]

---

[1] Complaint ¶¶45-52 at 11-12, docket no. 2, filed February 16, 2021.

[2] *Id*. ¶¶53-70 at 12-16.

[3] Plaintiffs' Motion for Summary Judgment and Memorandum in Support ("Plaintiffs' Motion"), docket no. 49, filed August 24, 2022. Defendant United's Motion for Summary Judgment and supporting Memorandum ("United's Motion"), docket no. 47, filed August 24, 2022.

[4] Defendant United's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgement ("United's Opposition"), docket no. 59,  filed September 28, 2022; Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition"), docket no. 58, filed September 28, 2022; Reply Memorandum in Further Support of Defendant United's Motion for Summary Judgment ("United's Reply"), docket no. 65, filed October 19,

Having carefully reviewed the parties' briefing, record evidence, and considered relevant law, Plaintiffs' Motion is GRANTED in part and DENIED in part, and United's Motion is GRANTED in part and DENIED in part. Plaintiffs' ERISA benefits claim is GRANTED from December 13, 2017, until December 29, 2017, and otherwise DISMISSED with prejudiced. Plaintiffs' Parity Act claim is DISMISSED with prejudice.

## Table of Contents

A.      BACKGROUND ....................................................................................... 2
B.      UNDISPUTED MATERIAL FACTS ........................................................ 3
        1.      The Plan ........................................................................................ 3
        2.      Medical Necessary Criteria ......................................................... 5
        3.      J.T.'s Medical History and Treatment ......................................... 8
        4.      Ashcreek's Corrected Claim Submissions .................................. 13
C.      SUMMARY JUDGMENT STANDARD .................................................. 15
D.      DISCUSSION ........................................................................................... 15
        1.      J.T.'s Claim for RTC-level Treatment ........................................ 15
                a.      Standard of Review ........................................................... 16
                b.      The Facts in the Administrative Record Regarding Ashcreek's Initial and Revised Claim Submissions are Reviewable to Determine if Plaintiffs Establish that the RTC Treatment was Medically Necessary .................. 17
                c.      The Plan Does Not Cover J.T.'s RTC treatment except from December 30, 2017, until January 23, 2018 ........................ 18
        2.      Plaintiffs fail to establish a Parity Act violation ....................... 26
                a.      Plaintiffs have standing to pursue their Parity Act claim ........................ 26
                b.      The Parity Act ................................................................... 27
                c.      Plaintiffs fail to state a Parity Act claim. ....................... 29
E.      ORDER ...................................................................................................... 33

## A.      BACKGROUND

Plaintiff S.T. is a participant in the Insperity Group Health Plan (the "Plan") and his son J.T. is a beneficiary of the Plan. On December 7, 2017, J.T. began receiving mental health treatment from an out-of-network provider, Ashcreek Ranch Academy ("Ashcreek"). Ashcreek requested approval from United to provide J.T. with mental health treatment at the Residual

---

2022; Plaintiffs' Reply in Support of Motion For Summary Judgment ("Plaintiffs' Reply"), docket no. 67, filed October 19, 2022.

Treatment Center ("RTC") level. United denied Ashcreek's request for RTC treatment, but approved several claims at lower levels of care. Ashcreek initially billed and accepted payment at these lower levels of treatment, but 15 months later submitted amended claims requesting reimbursement for RTC-level services. United denied the amended claims. Plaintiffs then filed suit asserting that United wrongly denied its amended claims for coverage for J.T.'s treatment from December 7, 2017, until March 11, 2019, at the RTC level-of-care and a Parity Act claim.

### B.     UNDISPUTED MATERIAL FACTS[5]

#### 1.     The Plan

a.     The Plan provides coverage for medical necessary treatment and excludes coverage for services that are not medically necessary even if the treating physician recommends that level of service.[6]

b.     The Plan states prior authorization is required for Covered Health Services from non-network providers, and Ashcreek is a non-network provider.[7]

c.     In the event of a disagreement between a pre-service request and an adverse claim determination by United, the Plan provides for an internal administrative appeal and a voluntary external appeal to an Independent Review Organization ("IRO") for review of a clinical benefit determination.[8]

---

[5] The following Undisputed Material Facts are taken from both Plaintiffs' Motion and United's Motion. The parties did not significantly dispute the facts proposed by the other party. Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Material Facts are either disputed; not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, some of these Undisputed Material Facts may not be material to the disposition of the parties' motions, but are nevertheless included to give background and context to the issues raised in the motions. The facts have been restated in some instances.

[6] United's Motion, ¶2 at 3 (citing Admin. Rec., docket no. 51-1, at 1, 74, filed September 28, 2022).

[7] *Id*. ¶21 at 8 (citing Admin. Rec., docket no. 51-1, at 206).

[8] *Id*. ¶25 at 8 (citing Admin. Rec., docket no. 51-1, at 164-66).

d.      The Plan provides for coverage of mental health treatment at different levels of intensity. The highest level is inpatient hospital care, which is appropriate for patients that need acute short-term care.[9] Intermediate services are the next level, and they provide 24-hour care, but are less restrictive than inpatient hospital care.[10]

e.      Intermediate services include RTC for mental health, Skilled Nursing Facility ("SNF") for medical and surgical treatment, and Inpatient Rehabilitation Facilities ("IRF") for substance-abuse treatment.[11]

f.      For RTC services to be medically necessary under the Plan, the member must require 24-hour treatment for symptoms that interfere with the member's or others' safety or that would "undermine engagement in a less intensive level of care without the intensity of services offered in" RTC.[12] RTC services are only medically necessary if the member's condition is not so severe that the member requires the more intensive services provided in a hospital setting.[13] If the member's condition is not so severe that the member does not require 24-hour supervision, RTC would not be medically necessary.[14]

g.      The Plan covers services at lower intensities of treatment, including partial hospitalization program ("PHP") that provides at least 20 hours of services per week for members who are experiencing "serious" symptoms that "result in significant personal distress and/or significant psychological and environmental issues."[15] The Plan provides coverage for

---

[9] *Id*. ¶11 at 5 (citing Admin. Rec., docket no. 51-1, at 306).

[10] *Id*. ¶12 at 5-6 (citing Admin. Rec., docket no. 51-1, at 578).

[11] *Id*. ¶12 at 5 (citing Admin. Rec., docket no. 51-1, at 22-23).

[12] *Id*. ¶12 at 5-6 (citing Admin. Rec., docket no. 51-1,  at 578).

[13] *Id*. ¶12 at 6 (citing Admin. Rec., docket no. 51-1, at 591-92).

[14] *Id*. ¶12 at 6 (citing Admin. Rec., docket no. 51-1, at 610-11).

[15] *Id*. ¶14 at 6 (citing Admin. Rec., docket no. 51-1, at 576-77).

intensive outpatient programs ("IOP") that provide at least 9 hours per week for adults and 6 hours per week for children who are experiencing moderate signs and symptoms.[16]

h.      At the lowest intensity, the Plan covers outpatient services provided in an office setting.[17]

i.      Preauthorization of non-network mental health benefits includes scheduled admission for RTC, PHP, and IOP.[18]

j.      If a pre-service request is denied, the Plan provides for an internal administrative appeal, which "must be submitted to us within 180 days after you receive the claim denial."[19]

**2.      Medical Necessary Criteria**

a.      United utilizes the Optum Level of Care Guidelines ("2019 LOC Guidelines") to review J.T.'s request for RTC benefits.[20]

b.      The 2019 LOC Guidelines are "based on the National Standards of Care and best practice guidelines for a member's given diagnosis."[21]

c.      The Plan provides coverage for medically necessary treatment and defines the term "Medical Necessary" as:

> health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance related and addictive disorders, condition, disease or its symptoms, that are all of the following as determined solely by us or our designee.
>
> • In accordance with Generally Accepted Standards of Medical Practice.

---

[16] *Id*. ¶14 at 6 (citing Admin. Rec., docket no. 51-1, at 574-75).

[17] *Id*. ¶14 at 7 (citing Admin. Rec., docket no. 51-1, at 572-74).

[18] *Id*. ¶22 at 8 (citing Admin. Rec., docket no. 51-1, at 206-207, 394-95).

[19] *Id*. ¶25 at 8 (citing Admin. Rec., docket no. 51-1, at 164-65).

[20] *Id*. ¶15 at 7 (citing Admin. Rec., docket no. 51-1, at 638-667).

[21] *Id*. ¶19 at 7.

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.

- Not mainly for your convenience or that of your doctor or other health care provider.

- Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[22]

d. 

---



e.      At the time of Plaintiffs' claims, United used the 21st Edition and 22nd Edition of

the Millman Care Guidelines ("MCG") to evaluate the medical necessity of SNFs and IRFs.[24]

---

[23] *Id*. ¶57 at 18-20 (citing Admin. Rec., docket no. 51-1, at 578).

[24] United's Motion, ¶17 at 7 (citing S.T. v. United, docket no. 52-8, at 6133-7018, 7019-7962).

### 3.    J.T.'s Medical History and Treatment

a.    J.T. was born in January of 2001, and adopted by S.T. and his wife shortly thereafter.[25]

b.    In the spring of 2014, J.T. began meeting with Dr. Jay Tarnow, a psychiatrist who diagnosed J.T. with anxiety, depression, and ADHD.[26]

c.    In the summer of 2016, J.T. had a panic attack that was severe enough that he was evaluated at the emergency room.[27]

d.    Following the panic attack, J.T. was diagnosed with an anxiety disorder.[28]

e.    During the summer of 2017, J.T. experienced violent outbursts, social anxiety, and panic attacks.[29]

f.    Following an incident where J.T. punched a glass lantern and refused to return to school, J.T. was admitted to a licensed outdoor behavioral health program, Elements Wilderness ("Elements"), on September 27, 2017.[30]

g.    J.T. was discharged from Elements on December 7, 2017, and admitted to Ashcreek, for treatment of major depressive disorder, generalized anxiety, social anxiety, attention-deficit/hyperactivity.[31]

h.    On December 13, 2017, United's Violeta Georgiew, a Licensed Clinical Professional Counselor ("LCPC"), conducted a peer review with attending physician Dr. Jake

---

[25] Plaintiffs' Motion, ¶3 at 3 (citing Admin. Rec., docket no. 51-2, at 1832).

[26] Id. ¶20-21 at 5-6 (citing Admin. Rec., docket no. 51-2, at 1833).

[27] Id. ¶33 at 9 (citing Admin. Rec., docket no. 51-2, at 1835).

[28] Id. ¶34 at 9 (citing Admin. Rec., docket no. 51-2, at 1835).

[29] Id. ¶37 at 11 (citing Admin. Rec., docket no. 51-2, at 1836).

[30] Id. ¶39 at 11 (citing Admin. Rec., docket no. 51-2, at 1836).

[31] United's Opposition, docket no. 59, ¶20 at 12 (citing Admin. Rec. docket 51-1, at 1444-45).

Roberts of Ashcreek to discuss Ashcreek's request for authorization of seven days of treatment at the RTC level from December 13, 2017, through December 19, 2017.[32]

      i.     The claim note from December 13, 2017, stated that J.T. was enrolled in a wilderness program for two (2) months "to work through anger management." The note also states J.T.'s anger is now controlled, and his history of verbal bullying and self-harm was three-to-four years old.[33]

      j.     On December 13, 2017, Ms. Georgiew recommended authorization at the less intense IOP level of care because RTC level of care was not medically necessary, and United advised Ashcreek of a peer-to-peer review scheduled for December 18, 2017, which would determine the level of care for J. T's treatment.[34]

      k.     A United claim note from December 18, 2017, states that United's Medical Director, Dr. Kathy Scott-Gurnell, attempted to call J.T.'s treating physician Dr. Jake Roberts, but Dr. Roberts did not return the call.[35]

      l.     On December 18, 2017, United's Dr. Scott-Gurnell conducted a peer-to-peer review based on the available clinical information, including claim notes.[36]

      m.     The case notes used by Dr. Scott-Gurnell in her determination state: "Verbal and physical aggression at home, property destruction. Anxiety, depression, when [he] feels this way becomes aggressive, parents did not feel safe in the house . . . having some [high-risk behaviors] due to depression and anxiety. No mood disturbances noted, caller reports 'he is still in the

---

[32] United's Motion, docket no. 47, ¶30 at 9 (citing Admin. Rec., docket 51-1, at 1447-49).

[33] Id. ¶29 at 9 (citing Admin. Rec., docket no. 51-1, at 1446).

[34] Id. ¶30 at 9 (citing Admin. Rec., docket no. 51-1, at 1447-49).

[35] Id. ¶31 at 9-10 (citing Admin. Rec., docket no. 51-1, at 1450-51).

[36] Id. ¶3 at 9-10 (citing Admin. Rec., docket no. 51-1, at 1450-51).

honeymoon phase.' 1 month ago had suicide thoughts [with] no plan. Monitoring due to this statement a month ago. [History] of self-harm but hasn't happened in 3 to 4 years. Sent to [Elements] to work on anger management. Feel [RTC] is appropriate due to anger now under control [sic][.] Sent to [RTC] for [treatment] for depression and anxiety."[37]

 n. Dr. Scott-Gurnell denied Ashcreek's request for authorization for RTC treatment because it was not medically necessary from December 13, 2017, until December 19, 2017, and Dr. Scott-Gurnell approved PHP treatment.[38]

 o. Dr. Scott-Gurnell noted that RTC treatment from December 13, 2017, until December 19, 2017, was not medically necessary because: "[J.T.'s] anger has improved and now he is seeking residential treatment for his depression and anxiety. He has a supportive family and can continue his care in a less restrictive environment."[39]

 p. On December 18, 2017, an Ashcreek representative, identified as "Nate," informed Ms. Georgiew during a phone call that: (1) Nate accepted United's determination of a PHP level of care; and (2) J.T.'s parents "have told facility they will pay for boarding 7days/wk as [Medical Billing & Reimbursement] is out of state."[40]

 q. A claim note dated December 29, 2017, documents that United reviewer Maria Karayianni, reviewed Ashcreek's request for authorization for J.T.'s PHP treatment, and authorized four (4) days of treatment from December 22, 2017, through December 29, 2017.[41]

---

[37] *Id*. ¶29 at 9 (citing Admin. Rec., docket no. 51-1, at 1451-53).

[38] *Id*. ¶32 at 10 (citing Admin. Rec., docket no. 51-1, at 1451-52).

[39] *Id*. ¶32 at 10 (citing Admin. Rec., docket no. 51-1, at 1451-53).

[40] *Id*. ¶33 at 10 (citing Admin. Rec., docket no. 51-1, at 1544).

[41] *Id*. ¶34 at 10 (citing Admin. Rec., docket no. 51-1, at 1453-55).

r.      United attempted to contact Ashcreek on December 29, 2017, and January 2, 2018, to request clinical information to support authorization of J.T.'s treatment at the PHP level of care, but Ashcreek did not respond.[42]

s.      During the week of January 3, 2018, J.T. told his therapist that he attempted suicide twice in the past week.[43]

t.      For one of the suicide attempts, J.T. informed his therapist that he repeatedly slammed his head into the wall, and J.T. did not inform his therapist how he tried to commit suicide on the other occasion.[44]

u.      On January 16, 17, and 19, 2018, United requested additional information about J.T.'s care from Ashcreek, but Ashcreek did not respond.[45]

v.      From December 18, 2017, through January 22, 2018, United approved 24 days of treatment for J.T. at the PHP level of care.[46]

w.      United received bills from Ashcreek for J.T.'s PHP services rendered from December 7, 2017, through December 29, 2017, and UBH paid Ashcreek for the services that were authorized and billed.[47]

x.      On January 22, 2018, United's Andrea Gaston and United's Dr. N. Sane concluded that J.T. could be stepped down from PHP to a less intensive level of care, and this

---

[42] *Id*. ¶35 at 11 (citing Admin. Rec., docket no. 51-1, at 1457-59).

[43] Plaintiffs' Motion, ¶45a at 12 (citing Admin. Rec., docket no. 51-8, at 4424).

[44] *Id*. ¶45a at 12 (citing Admin. Rec., docket no. 51-8, at 4424).

[45] United's Motion, ¶38 at 11 (citing Admin. Rec., docket no. 51-1, at 1475-76).

[46] *Id*. ¶42 at 12 (citing Admin. Rec., docket no. 51-1, at 698-717).

[47] *Id*. ¶¶42-43 at 12 (citing Admin. Rec., docket no. 51-1, at 698-717,726-39, 730-35).

claim was referred to an Outside Review Agency ("ORA") for a peer-to-peer review with Ashcreek.[48]

y.      On January 23, 2018, the ORA's Dr. Joel Axler, Board Certified in Psychiatry with a subspecialty certification in Child/Adolescent Psychiatry, conducted his review after he left multiple messages with Ashcreek that went unanswered.[49]

z.      Dr. Axler conducted a clinical file review and concluded that PHP level of care was no longer medically necessary as of January 23, 2018, and that J.T. could continue his treatment at a less intensive level of care.[50]

aa.     On January 23, 2018, United's Medical Director, Dr. Rakesh Desai, reviewed J.T.'s file and Dr. Axler's peer-review report and opinion and determined that PHP treatment was no longer medically necessary.[51]

bb.     On January 26, 2018, United's Social Worker Andrea Gaston approved Ashcreek's request for authorization for J.T.'s stepped-down treatment at the IOP level of care from January 24, 2018, through January 30, 2018.[52]

cc.     On February 1, 2018, Ashcreek sought further authorization for J.T.'s IOP level of care treatment, and United approved six sessions of IOP treatment available from February 1, 2018, until April 1, 2018, but noted that Ashcreek's clinical information did not appear to support that J.T. was receiving IOP level of care at this facility.[53]

---

[48] *Id*. ¶39 at 11 (citing Admin. Rec., docket no. 51-1, at 1476-83).

[49] United's Motion, ¶40 at 11-12 (citing Admin. Rec., docket no. 51-1, at 1492-1501).

[50] *Id*. ¶40 at 11-12 (citing Admin. Rec., docket no. 51-1, at 1492-1501).

[51] *Id*. ¶41 at 12 (citing Admin. Rec., docket no. 51-1, at 1501-1503).

[52] *Id*. ¶44 at 12 (citing Admin. Rec., docket no. 51-1, at 1503-1506).

[53] *Id*. ¶45 at 12-13 (citing Admin. Rec., docket no. 51-1, at 1511).

dd.     By letters dated April 9 and 23, 2018, and May 9, 2018, Ashcreek requested reconsideration of its claims for treatment rendered to J.T. at the IOP level of care from February 8, 2018, through March 5, 2018.[54]

ee.     On June 28, 2018, J.T. was found in his room with a tie wrapped around his neck while he was pulling on it tightly.[55]

ff.     On August 23, 2018, United upheld its initial adverse benefit determination for Ashcreek's claim for IOP services rendered to J.T. from February 12, 2018, through March 5, 2018.[56]

gg.     United reasoned that J.T. no longer needed IOP treatment and could have continued at the less intensive outpatient (OP) level of care.[57]

hh.     On October 30, 2018, Ashcreek called United to verify J.T.'s benefits for OP services and to confirm that Ashcreek is an out-of-network provider.[58]

**4.     Ashcreek's Corrected Claim Submissions**

a.     In May 2019, for the first time, Ashcreek submitted corrected claims for J.T.'s treatment from December 7, 2017, through March 11, 2019, for RTC services.[59]

b.     United denied and did not pay Ashcreek for these corrected claims.[60]

---

[54] *Id*. ¶46 at 13 (citing Admin. Rec., docket no. 51-1, at 1609, 1659, 1681).

[55] Plaintiffs' Motion, ¶45i at 13 (citing Admin. Rec., docket no. 51-1, at 1575).

[56] United's Motion, ¶47 at 13 (citing Admin. Rec., docket no. 51-2, at 1759-1760).

[57] *Id*. ¶47 at 13 (citing Admin. Rec., docket no. 51-2, at 1759-1760).

[58] *Id*. ¶50 at 14 (citing Admin. Rec., docket no. 51-1,  at 1524).

[59] *Id*. ¶53 at 14 (citing Admin. Rec., docket no. 51-1 at 936-1055).

[60] *Id*. ¶54 at 15 (citing Admin. Rec., docket no. 51-1 at 1421-40).

c.     On September 3, 2019, J.T.'s treating physician Dr. W. Walker Peacock sent a letter to United where he objected to United's denial of coverage decision.[61]

d.     Dr. Peacock's letter states that PHP level of care, such as the kind that United recommends, will cause J.T. to return to unpredictable, dangerous and suicidal behaviors.[62]

e.     On November 12, 2019, Plaintiffs submitted an appeal of United's denials of Ashcreek's corrected claims for RTC treatment from December 7, 2017, through March 11, 2019.[63]

f.     On January 17, 2020, United's Dr. Edward Collopy, Board Certified in Psychiatry and Neurology Psychiatry, reviewed all medical records and determined that J.T.'s RTC treatment from December 7, 2017, to December 12, 2017, was not medically necessary.[64]

g.     Dr. Collopy's opinion reasoned:

> You were admitted for treatment of depression and anxiety. After reviewing the medical records, you did not need the type of care provided in this setting. You were medically stable. You were not having thoughts to harm yourself or others. You were able to participate in your treatment. You took your medications. You maintained good control. You had family support. There was no other clinical information provided to support the medical necessity for mental health treatment in a 24 hour/day residential treatment setting.[65]

h.     By letter dated February 27, 2020, Plaintiffs submitted to United and the Texas Department of Insurance a Member Complaint concerning United's denials of coverage for J.T.'s purported RTC treatment at Ashcreek from December 7, 2017, through March 11, 2019.[66]

---

[61] Plaintiffs' Motion, ¶50 at 16 (citing Admin. Rec., docket no. 52-7, at 5786-87).

[62] Id. ¶50 at 16 (citing Admin. Rec., docket no. 52-7, at 5786-87).

[63] United's Motion, ¶55 at 15 (citing Admin. Rec., docket no. 51-2, at 1782).

[64] Id. ¶58 at 15-16 (citing Admin. Rec., docket no. 51-4, at 3042-43).

[65] Id. ¶58 at 15-16 (citing Admin. Rec., docket no. 51-4, at 3042-43).

[66] Id. ¶59 at 16 (citing Admin. Rec., docket no. 51-5, at 3056-3060).

i.      An appeal note dated May 19, 2020, states that United's Dr. H. Wong conducted a voluntary internal appeal review of the medical necessity of Plaintiffs' claim for coverage of J.T.'s purported RTC treatment at Ashcreek from December 13, 2017, through March 11, 2019, and again held up the denial of this the claim due to a lack of medical necessity.[67]

## C.      SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, when "the parties in an ERISA case both move[] for summary judgment and stipulate[] that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[68]

## D.      DISCUSSION

Plaintiffs' Complaint presents two separate claims: (1) whether J.T.'s RTC-level treatment from December 13, 2017, through March 11, 2019, was medically necessary and, therefore, covered by the Plan; and (2) whether United's Plan violated the Parity Act.

### 1.      J.T.'s Claim for RTC-level Treatment

Plaintiffs argue that United's denial of J.T.'s claim for RTC benefits violated the terms of the Plan because the RTC benefits were medically necessary.[69] United argues Plaintiffs cannot recover benefits for RTC Treatment because: (1) Ashcreek agreed to provide and authorized

---

[67] *Id*. ¶62 at 16 (citing Admin. Rec. docket no. 51-1, at 1571-77).

[68] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation marks omitted); Plaintiffs' Motion, at 22-23; United's Motion, at 18.

[69] Plaintiffs' Motion, at 28-31.

services at lower levels of treatment; (2) RTC-level services were not medically necessary; and (3) Ashcreek improperly submitted corrected claims seeking payment for J.T.'s purported RTC level of care.[70]

### a.  Standard of Review

The parties agree that the administrator's decision to deny benefits should be reviewed *de novo*.[71] Under the *de novo* standard, an administrator's decision is upheld if it was correct in light of the evidence that was before the administrator after making an "independent determination."[72] "When applying a de novo standard in the ERISA context, the role of the [district] court reviewing a denial of benefits is to determine whether the administrator made a correct decision. The administrator's decision is accorded no deference or presumption of correctness."[73] Moreover, the district court "independently reviews the facts and opinions in the administrative record to determine whether [the administrator] made a correct benefits decision based on the rationales articulated in the record."[74]

"[T]he insured has the burden of showing that a covered loss has occurred[.]"[75] And "only those rationales that were specifically articulated in the administrative record as the basis for denying a claim" are considered.[76] "[T]he standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for

---

[70] United's Motion, at 12-15.

[71] *Id*. at 18-19; Plaintiffs' Motion, at 23-24.

[72] *Holbrooks v. Sun Life Assur. Co. of Canada*, 570 Fed. App'x 831, 834 (10th Cir. 2014).

[73] *Niles v. Am. Airlines, Inc.*, 269 Fed. App'x 827, 832 (10th Cir. 2008).

[74] *Doe v. Intermountain Healthcare, Inc.*, 2:18-cv-807-RJS-JCB, 2023 WL 5395526, at *16 (D. Utah Aug. 22, 2023) (internal quotation marks omitted) (citations omitted).

[75] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009).

[76] *L.D. v. UnitedHealthcare Ins.*, 1:21-cv-00121-RJS-DBP, 2023 WL 4847421, at *11 (D. Utah July 28, 2023) (internal quotation marks omitted) (citations omitted).

benefits is supported by a preponderance of the evidence based on the district court's independent review."[77]

> **b. The Facts in the Administrative Record Regarding Ashcreek's Initial and Revised Claim Submissions are Reviewable to Determine if Plaintiffs Establish that the RTC Treatment was Medically Necessary**

As an initial matter, Plaintiffs argue that it is improper to consider: (1) facts related to Ashcreek's initial billing, requests for payment, and agreements to provide J.T. with PHP and IOP services; or (2) Ashcreek's decision to file corrected claims for RTC services fifteen months later.[78] Plaintiffs reason that these facts constitute an improper "new rationale" that United never articulated to Plaintiffs in United's denial letters.

For ERISA claims, the district court "may consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim."[79] The district court is tasked with reviewing "facts and opinions in the administrative record to determine whether [the insurance company] made a correct benefits decision based on the rationales articulated in the record."[80]

Here, United's rationale for denying the claim was that the RTC treatment was not medically necessary.[81] Information regarding Ashcreek's billing history for J.T.'s treatment constitute "facts in the administrative record" that the district court may rely on in determining whether United made a correct benefits decision. The facts related to Ashcreek's initial and revised claim submissions do not constitute a "new rationale" for denying Plaintiffs' claim.

---

[77] *Niles*, 269 Fed. App'x at 833.

[78] Plaintiffs' Opposition, at 4-7.

[79] *Doe*, 2023 WL 5395526, at *17  (citations omitted).

[80] *Id*. at *16 (internal quotation marks omitted) (citations omitted).

[81] United's Motion, at 21-24.

Instead, these facts from the administrative record may be reviewed because they are relevant in determining whether the RTC treatment was medically necessary since they provide some evidence of how J.T.'s claim was viewed by Ashcreek and United at the time the claims were made.

### c. The Plan Does Not Cover J.T.'s RTC treatment except from December 30, 2017, until January 23, 2018

Plaintiffs argue that J.T.'s RTC treatment was medically necessary and, therefore, covered by the Plan from December 13, 2017, until March 31, 2019, because he: (1) engaged in a pattern of violent and anti-social behaviors; (2) attempted suicide the week of January 3, 2018, during his stay at Ashcreek; (3) destroyed a school computer on January 3, 2018; and (4) experienced hallucinations the morning of January 11, 2018. [82]

"[T]he issue of whether residential treatment is medically necessary turns on more than just risk of harm; it also requires a finding that the individual's disorder [cannot] be properly managed outside of a 24-hour structured setting or other appropriate outpatient setting."[83] Generally, under the Plan, RTC treatment is medically necessary when the member has: (1) psychosocial and environmental problems that likely threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services of RTC; (2) acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member is endangered; and (3) the factors leading to admission cannot be safely, efficiently or effectively assessed and treated in a less intensive setting that does not have 24-hour care.[84]

---

[82] United's Motion, at 12-15; Plaintiffs' Motion, at 12-15, 28-31.

[83] *Mary D. v. Anthem Blue Cross Blue Shield*, 778 Fed. App'x 580, 591 (10th Cir. 2019) (citing the Plan's standard for RTC treatment).

[84] Admin. Rec. docket no. 51-1, at 591-92, 576-78.

### i. Plaintiffs fail to establish that J.T's RTC treatment from December 13, 2017, through December 29, 2017, was medically necessary.

For the period December 13 – 29, 2017, United denied coverage of RTC services[85] but United authorized PHP services from December 18, 2017, through January 22, 2018.[86] For ERISA appeals, the patient's treatment notes and physician opinions that were relevant to the level-of-care determination are analyzed to determine medical necessity.[87] The claim note from December 13, 2017, states J.T. had a history of verbal bullying and self-harm, but also noted that he had not engaged in self-harm for three-to-four years.[88] On December 18, 2017, United's Dr. Scott-Gurnell reviewed J.T.'s medical record and noted:

> [J.T.'s] anger has improved and now he is seeking residential treatment for his depression and anxiety. He is not reporting any passive or fleeting thoughts of suicide. He is not psychotic. He appears cooperative and is adjusting to the program. The member does not appear to require [24-hour] monitoring while undergoing treatment for his mood and anxiety. He has a supportive family and can continue his care in a less restrictive environment. [89]

On December 18, 2017, United's Dr. Scott-Gurnell called Ashcreek's Dr. Jake Roberts for a peer review of J.T.'s level of care, but Dr. Roberts did not return the call.[90] Dr. Scott-Gurnell approved J.T. for PHP treatment from December 13, 2019, until December 19, 2019.[91] Later on December 18, 2017, an Ashcreek representative named "Nate" informed United that Ashcreek accepted their determination and J.T.'s parents would pay for his boarding.[92] United received bills from

---

[85] Undisputed Facts 3(n), 3(q); Admin. Rec., docket no. 51-1, at 1451-55.

[86] Undisputed Facts 3(v); Admin. Rec., docket no. 51-1, at 698-717.

[87] See *L.D.*, 2023 WL 4847421, at *13.

[88] United's Motion, at 9.

[89] *Id*. at 13; Admin. Rec., docket no. 51-1, at 1450-52.

[90] *Id*. ¶31 at 9-10 (citing Admin. Rec., docket no. 51-1, at 1450-51).

[91] Admin. Rec., docket no. 51-1, at 1451-52.

[92] *Id*. ¶33 at 10 (citing Admin. Rec., docket no. 51-1, at 1544).

Ashcreek for J.T.'s PHP services rendered from December 7– 29, 2017, and UBH paid Ashcreek for those services.[93]

The administrative record establishes that J.T.'s therapist, Dr. Neal Christensen, recommended that J.T. be placed in a RTC program after he was discharged from Elements.[94] However, Plaintiffs do not include a timeline of events to support their claim that J.T.'s RTC treatment was medically necessary.[95] In other words, Plaintiffs do not cite to any treatment notes or events in the Administrative Record from September 27, 2017, until December 29, 2017, to support their claim for RTC treatment during this time period.[96] Therefore, Plaintiffs fail to establish by a preponderance of the evidence that the RTC level-of-care was medically necessary from December 13, 2017, until December 29, 2017.

> ## ii.   Plaintiffs establish that J.T.'s RTC treatment from December 30, 2017, until January 23, 2018, was medically necessary.

J.T.'s treatment notes from December 30, 2017, until January 23, 2018, establish that RTC treatment was medically necessary for this time period. During the week of January 3, 2018, J.T. told his therapist that he attempted suicide twice in the prior week.[97] On January 2, 2018, J.T. reported that he was hallucinating to Ashcreek's staff.[98] On January 4, 2018, J.T.'s medications were changed.[99] And on January 12, 2018, Ashcreek's Doug Shearer wrote in J.T's

---

[93] *Id*. ¶¶42-43 at 12 (citing Admin. Rec., docket no. 51-1, at 698-717,726-39, 730-35).

[94] Admin. Rec., docket no. 51-2, at 1836; *see also* Plaintiffs' Motion, at 12.

[95] Plaintiffs' Motion, at 12-15.

[96] *Id*. at 11-15.

[97] *Id*. at 12; Admin. Rec., docket no. 51-8, at 4424.

[98] Admin. Rec., docket no. 51-1, at 4542.

[99] Admin. Rec., docket no. 51-1, at 1487.

treatment notes that: "Sue put [J.T.] in the living room because he was having hallucinations, he slept all night we had no problems with him."[100]

United attempted to contact Ashcreek on December 29, 2017, January 2, 2018, January 16, 2018, January 17, 2018, and January 19, 2018, but Ashcreek did not respond.[101] On January 22, 2018, United's Andrea Gaston and United's Dr. N. Sane concluded that J.T. could be stepped down from PHP to a less intensive level of care, and this claim was referred to an Outside Review Agency ("ORA") for a peer-to-peer review with Ashcreek.[102] United may not have been aware of J.T.'s condition during this time period when it made its initial claim determination because Ashcreek was not responsive to United's requests for information. However, United reviewed J.T.'s appeal on May 19, 2020, and United's claim notes state it analyzed J.T.'s treatment notes from December 2017 and January 2018 for this appeal.[103]

The information in the record establishes by a preponderance of evidence that RTC services from December 30, 2017, until January 23, 2018, was medically necessary and covered by the Plan. Specifically, the RTC treatment was medically necessary for this time period because: (1) J.T. had a history of committing self-harm three or four years before this time period; (2) he reported two attempts to commit suicide to a therapist during the week of January 3, 2018; and (3) it was reported that J.T. was hallucinating on January 2, 2018, and January 12, 2018. The LOC Guidelines state that a suicide attempt can be a justification for inpatient care, which is the highest level of treatment available.[104] Moreover, the RTC level-of-care was

---

[100] Admin. Rec., docket no. 51-8 at 4525.

[101] United's Motion, ¶¶35, 38 at 11 (citing Admin. Rec., docket no. 51-1, at 1457-59, 1475-76).

[102] *Id*. ¶39 at 11 (citing Admin. Rec. docket no. 51-1, at 1476-83).

[103] *Id*. ¶62 at 16 (citing Admin. Rec. docket no. 51-1, at 1571, 1575).

[104] Admin. Rec., docket no. 51-1, at 580, 646.

medically necessary during this time period because: (1) J.T.'s impairment of behavior appeared to be interfering with his activities of daily living to the point where he was endangered and his safety was threatened; (2) J.T.'s medical condition could not be safely treated at a lower level of care; and (3) 24-hour treatment was clinically appropriate for a certain period of time given the facts in the record.[105] Therefore, Plaintiffs have established entitlement to benefits for J.T.'s RTC treatment from December 30, 2017, until January 23, 2018.

### iii. Plaintiffs fail to establish that J.T's RTC treatment from January 24, 2018, until May 14, 2018, was medically necessary.

On January 22, 2018, United's Andrea Gaston and United's Dr. N. Sane concluded that J.T. could be stepped down from PHP treatment to a less intensive treatment, and the claim was referred to an OAR for a peer-to-peer review.[106] On January 23, 2018, Dr. Axler conducted a clinical file review and concluded that PHP treatment was no longer medically necessary as of January 23, 2018, and that J.T. could continue his treatment at a less intensive level of care.[107] Dr. Axler's review states: "no active [suicide ideation] or imminent risk no aggression [homicide ideation] . . . no med changes since 1/4/218[.]"[108]  On February 1, 2018, Ashcreek sought further authorization for J.T.'s IOP level of care treatment, and United approved six sessions of IOP treatment available from February 1, 2018, until April 1, 2018, but noted that Ashcreek's clinical information did not appear to support that J.T. was receiving IOP level of care at this facility.[109]

---

[105] *See* Admin. Rec., docket no. 51-1, at 578.

[106] United's Motion, ¶39 at 11 (citing Admin. Rec., docket no. 51-1, at 1476-83).

[107] United's Motion, ¶40 at 11-12 (citing Admin. Rec., docket no. 51-1, at 1492-1501).

[108] Admin. Rec., docket no. 51-1, at 1487.

[109] United's Motion, ¶45 at 12-13 (citing Admin. Rec., docket no. 51-1, at 1511).

Plaintiffs' present a timeline of relevant events and treatment notes attempting to justify J.T.'s RTC-level treatment.[110] However, Plaintiffs' timeline does not contain any relevant events from January 24, 2018, until May 14, 2018, to justify treatment at the RTC level.[111] Based on at least two physicians concluding that the lower PHP-level treatment was no longer medically necessary for J.T. and the absence of facts to the contrary, Plaintiffs fail to establish that RTC treatment and 24-hour care was medically necessary from January 24, 2018, until May 14, 2018.

### iv.   Plaintiffs fail to establish that J.T's RTC treatment from May 15, 2018, until December 21, 2018, was medically necessary.

Plaintiffs argue that RTC treatment was medically necessary from May 15, 2018, until December 21, 2021, for numerous reasons.[112] Plaintiffs' reasoning includes: (1) on May 15, 2018, J.T. visited the emergency room due to a panic attack; (2) on May 29, 2018, J.T's medical records stated he posed a "moderate" suicide risk and he had a vague plan for suicide; (3) on June 9, 2018, J.T. punched and choked another student; (4) on June 28, 2018, J.T. made a suicidal gesture or attempt of suicide by wrapping a necktie around his neck; (5) on October 1, 2018, J.T.'s medical records noted that he was a "mild" risk of suicide with ideation but no definite plan; and (6) on December 21, 2018, J.T. displayed a distorted thought process that culminated with him lashing out at his parents.[113]

J.T.'s treatment notes from this time period include other information that is relevant in his level-of-care determination. On May 21, 2018, J.T. was: "involved in Spring Break week where no clinical services are provided, and only [experimental services are provided.] . . . [J.T.]

---

[110] Plaintiffs' Motion, at 12-15.

[111] *Id*. at 12-15.

[112] Plaintiffs' Motion, at 12-15.

[113] *Id*.

[h]andled it well."[114] On June 11, 2018, a treatment note stated: "[J.T.] still struggles with doing treatment his way, rather [than] attempting to use the tools that are given to him and thus he struggles over time until he explodes. He is not a risk to himself or others at this time though."[115] On June 28, 2018, another student informed staff that J.T. was trying to make himself pass out by wrapping a tie around his neck.[116] The staff found J.T. with a tie wrapped around his neck without a knot, and it was noted that J.T.'s neck did not have any markings on it.[117] J.T. later denied that this was a suicide attempt, and J.T. reported he was upset at the time because his parents were not allowing him to talk to his girlfriend.[118] On October 1, 2018, J.T.'s treatment note stated: "[J.T.] is in a fairly stable place at this time, and [J.T.] used his safety plan [by talking with students and staff after he felt like harming himself]."[119] On November 17, 2018, a treatment note stated that J.T. seemed more humble, and he was excited for a three-day home visit.[120]

J.T.'s treatment notes establish that he required some mental-health treatment from May 15, 2018, until December 21, 2018, but these treatment notes do not establish that RTC-level treatment was medically necessary. The record demonstrates that it was not medically necessary that J.T. receive 24-hour care or that J.T. could not be safely treated at a lower level of care. Therefore, Plaintiffs fail to establish that RTC treatment was medically necessary from May 15, 2018, until December 21, 2018.

---

[114] Admin. Rec., docket no. 52-1, at 4891.

[115] Admin. Rec., docket no. 52-1, at 4997.

[116] Admin. Rec., docket no. 52-4, at 5667.

[117] Admin. Rec., docket no. 52-4, at 5667.

[118] Admin. Rec., docket no. 51-1, 1537; United's Reply, at 12.

[119] Admin. Rec., docket no. 52-3, at 5358.

[120] Admin. Rec., docket no. 52-4, at 5527, 5530-32.

>            v.     **Plaintiffs fail to establish that J.T's RTC treatment from**
>                   **December 22, 2018, until March 31, 2019, was medically**
>                   **necessary.**

Plaintiffs argue that RTC treatment was medically necessary from December 22, 2018, until March 31, 2019.[121] However, Plaintiffs do not identify any symptoms, treatment notes, or events from this time period that justify RTC-level treatment.[122] Furthermore, the symptoms that Plaintiffs listed in the seven months prior to December 2018 did not establish that RTC-level treatment was medically necessary for that time period. And the record does not demonstrate that any new or worsening symptoms from December 22, 2018, until March 31, 2019, to warrant RTC-level treatment for this time period.

J.T.'s treatment notes from December 22, 2018, until March 31, 2019, establish that RTC-level treatment was not medically necessary for this time period. On January 16, 2019, J.T. reported to a staff member that he was happy.[123] The staff member reported J.T.'s mood was stable, and he was not having anxiety because he was following the rules and placing boundaries on other students.[124] On January 30, 2019, J.T. participated appropriately in group therapy, and provided the group with effective feedback.[125] On February 19, 2019, J.T. participated in group therapy where he cleaned horse stalls and fed the horses.[126] On March 4, 2019, J.T. once again participated in group therapy where he cleaned horse stalls and fed horses.[127] On March 6, 2019, J.T.'s progress note stated: "[J.T.] is leaving the RTC on Monday . . . . He is in a good mood

---

[121] Plaintiffs' Motion, at 28-31.

[122] Plaintiffs' Motion, at 12-15.

[123] Admin. Rec., docket no. 51-7, at 4290.

[124] Admin. Rec., docket no. 51-7, at 4290.

[125] Admin. Rec., docket no. 51-7, at 4270.

[126] Admin. Rec., docket no. 51-7, at 4245.

[127] Admin. Rec., docket no. 51-7, at 4228.

overall. . . . He is stable at this time."[128] And J.T.'s treatment notes from March 11-15, March 18-22, and March 25-29, 2019, state that he was absent from a class at Ashcreek because he was at his home, excused, or because he left the program.[129] Based on this record, Plaintiffs fail to establish that RTC-level treatment was medically necessary from December 22, 2018, until March 31, 2019.

### 2.      Plaintiffs fail to establish a Parity Act violation

Plaintiffs argue that United's Plan violates the Parity Act because: (1) United denied J.T.'s claim for RTC treatment because he lacked acute symptoms whereas United would not deny comparable medical and surgical treatment if the patient has "acute hospital needs"; (2) United only covers RTC treatment if there is a "reasonable expectation" the patient's condition will improve in a "reasonable period of time," and the comparable medical and surgical treatment does not have a similar limitation; and (3) United's Plan only covers RTC treatment if the admission criteria "continues to be met" and the comparable medical and surgical treatment does not have a similar limitation.[130] In response, United argues: (1) Plaintiffs lack standing; and (2) Plaintiffs' arguments lack merit because the Plan does not place more restrictive limitations on mental health treatment than comparable medical and surgical treatment.[131]

### a.      Plaintiffs have standing to pursue their Parity Act claim

United argues that Plaintiffs lack standing for their Parity Act claim because they have not suffered an injury from the alleged Parity Act violations.[132] But United offers no analysis to

---

[128] Admin. Rec., docket no. 51-7, at 4216.

[129] Admin. Rec., docket no. 51-7, at 4188-191, 4193, 4196-97, 4199, 4201, 4204-205, 4210, 4212.

[130] Plaintiffs' Motion, at 31-40; Admin Rec., docket no. 52-7, at 5808.

[131] United's Opposition, at 32-43.

[132] United's Opposition, at 44; United's Reply, at 28.

support its argument. Instead, United offers only the conclusory assertion that Plaintiffs have not

"suffered any injury from the alleged Parity Act violation[.]"[133]

"To satisfy the Constitution's restriction of this Court's jurisdiction to 'Cases' and

'Controversies,' Art. III, § 2, a plaintiff must demonstrate constitutional standing."[134] "To do so,

the plaintiff must show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and

that is likely to be redressed by a favorable judicial decision."[135]

Plaintiffs allege and argue that the treatment limitations for the Plan's RTC-level of care

were applied more restrictively than equivalent medical and surgical level of care.[136] According

to Plaintiffs, these more restrictive limitations contributed to United's decision to deny Plaintiffs'

claim for more than $150,000 in medical benefits.[137] Therefore, Plaintiffs have produced

sufficient evidence to allege a Parity Act claim. Specifically, Plaintiffs' allegations regarding

these treatment limitations are sufficient to satisfy standing because these treatment limitations

contributed to United's decision to deny Plaintiffs' claim.

### b.    The Parity Act

"Congress enacted the [Parity Act] to end discrimination in the provision of insurance

coverage for mental health and substance use disorders as compared to coverage for medical and

surgical conditions in employer-sponsored group health plans."[138] To comply with the Parity Act,

the Plan "must not impose more restrictive treatment limitations" on mental health benefits than

---

[133] United's Opposition, at 44; United's Reply, at 28.

[134] *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 196 (2017).

[135] *Id*. (internal quotation marks omitted).

[136] Plaintiffs' Motion, at 31-40; Defendants' Motion, at 33.

[137] Complaint, at 10.

[138] *L.C. v. Blue Cross & Blue Shield of Texas*, 2:21-cv-00319-DBB-JCB, 2023 WL 1930227, at *17 (D. Utah Feb. 10, 2023) (internal quotation marks omitted).

medical or surgical benefits.[139] In other words, the Parity Act "prevents insurance providers from writing or enforcing group health plans in a way that treats mental and medical health claims differently."[140]

Plaintiffs must establish four elements to demonstrate a Parity Act violation: "(1) the Plan is subject to the Parity Act; (2) the Plan provides benefits for both mental health and medical/surgical treatments; (3) Defendants placed differing and more restrictive limitations on benefits for mental health care as compared to medical/surgical care; and (4) the mental health benefit being limited is of the same classification as the comparable medical/surgical benefit."[141] "There are two types of treatment limitations under the [Parity Act]—quantitative limitations and nonquantitative treatment limitations ("NQTLs")."[142] NQTLs "limit the scope or duration of benefits for treatment" and include "[r]estrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits provided[.]"[143]

"Under the Parity Act, a plaintiff can make an as-applied challenge by alleging that, although the same [NQTL] is applied to both mental health/substance use disorder benefits and to medical/surgical benefits, it is not applied in a comparable way."[144] If the as-applied challenge involves NQTLs, the Parity Act "requires only that [NQTLs] for mental health benefits be 'comparable to' and 'applied no more stringently than for medical/surgical benefits.'"[145] "The

---

[139] *Jonathan Z. v. Oxford Health Plans*, 2:18-cv-00383-JNP-JCB, 2022 WL 2528362, at *17 (D. Utah July 7, 2022) (citing 29 U.S.C. § 1185a(a)(3)(A)).

[140] *Id*. at *17.

[141] *Id*.

[142] *L.C.*, 2023 WL 1930227, at *17.

[143] 29 C.F.R. § 2590.712(a)-(c).

[144] *L.C.*, 2023 WL 1930227, at *18.

[145] *Id*. (quoting *D.H. v. Blue Cross Blue Shield of Ill.*, 2:21-CV-00334-DAK, 2022 WL 1211515, at *2 (D. Utah Apr. 25, 2022)).

difference in requirements is not necessarily an improper limitation on mental health care, but recognition of the inherent difference in treatment at those facilities."[146]  Ultimately, a plaintiff must show "that the mental health or substance abuse services at issue meet the criteria imposed by [the] insurance plan and that the insurer imposed some additional criteria to deny coverage of the services at issue."[147] "Plaintiffs have the burden of proof."[148]

### c.    Plaintiffs fail to state a Parity Act claim.

Plaintiffs raise three Parity Act violations – one "as applied" claim and two Plan provision violations. All three claim variations fail.

### i.    Plaintiffs fail to establish a Parity Act violation because United's denial letter listed the absence of mental-health symptoms as the basis for the denial of coverage.

Plaintiffs argue that United committed an as-applied Parity Act violation because United's denial letter listed the absence of acute symptoms as the reason for the denial for J.T.'s RTC claim.[149] Specifically, the denial letter stated:

> You were medically stable. You were not having thoughts to harm yourself or others. You were able to participate in treatment. You took your medications. You maintained good control. You had family support. There was no other clinical information provided to support the medical necessity for mental health treatment in a 24 hour/day residential treatment setting.[150]

Plaintiffs' argument is based on the language of United's MCG Guidelines stating that coverage for an SNF will be denied if the beneficiary has "acute hospital needs."[151]  In other words, Plaintiffs argue that United violated the Parity Act by requiring the "absence of acute hospital

---

[146] *Id.*

[147] *Id.*

[148] *Id.* at *17.

[149] Plaintiffs' Motion, at 33-35.

[150] Admin Rec., docket no. 52-7, at 5808.

[151] United's Motion, at 20-21, 33-34;

needs" for medical and surgical claims, and United used the "absence of acute symptoms" to

deny J.T.'s mental health claims at the equivalent level of care.[152]



.[154] Therefore, Plaintiffs fail to establish that United violated the Parity Act on this

ground.

> ### ii.   The Plan's requirement that RTC treatment provides a "reasonable expectation" that RTC treatment will improve the beneficiary's problem in a "reasonable period of time" does not violate the Parity Act.

Second, Plaintiffs argue United violated the Parity Act because the Plan only covers RTC

treatment if there is a "reasonable expectation" that the treatment will improve the beneficiary's

---

[152] Plaintiffs' Motion, at 33-35.

[153] United's Motion, at 20-21.

[154] *See L.C.*, 2023 WL 1930227, at *19.

presenting problem within a "reasonable period of time."[155] Plaintiffs argue that a similar limitation does not exist for equivalent medical/surgical treatment.[156]

United's Plan requires that all types of treatment, (*i.e.*, mental-health treatment and medical and surgical treatment) at all levels, be medically necessary.[157] The Plan defines the term "medically necessary" to mean:

> Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.[158]

This definition establishes that all treatment must be *appropriate and effective* to be covered by the Plan regardless of whether the treatment is for medical, surgical, mental health, or substance-related care. The MCGs also have similar temporal restrictions on SNF treatment.[159] Specifically, under the Plan, SNFs are required to perform an "assessment of patient's changing condition to evaluate [the] need for treatment modification or for additional procedures until condition [is] stabilized[.]"[160]

Plaintiffs fail to explain why the phrases "reasonable expectation" and "reasonable period of time" are more restrictive than the requirements of "medical necessity" or the MCGs' temporal restrictions for SNFs.[161] Therefore, Plaintiffs fail to establish a Parity Act violation for this limitation on coverage for mental health treatment.

---

[155] Plaintiffs' Motion, at 35-36.

[156] *Id*.

[157] Admin. Rec., docket no. 51-1, at 1, 74.

[158] Plaintiffs' Motion, at 18; Admin. Rec., docket no. 51-1, at 117.

[159] S.T. v. United, docket no. 52-8, at 7019.

[160] *Id*.

[161] Plaintiffs' Motion, at 35-36; Plaintiffs' Reply, at 15-17.

### iii. Plaintiffs fail to establish a Parity Act violation based on the Plan only covering RTC treatment when the admission criteria "continues to be met."

Third, Plaintiffs argue that United violated the Parity Act because the Plan only provides coverage for RTC treatment if the admission criteria "continues to be met."[162] Plaintiffs argue that the Plan has no such limitation for the equivalent level of care for medical and surgical claims.[163]

Again, Plaintiffs failed to meet their burden that United committed a Parity Act violation. United's Plan requires that all types of treatment, (i.e., mental health and medical/surgical) at all levels be medically necessary.[164] ███████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████ █████████████████████████████████

█████████████████████ ██████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Therefore, Plaintiffs fail to establish a Parity Act violation for this limitation for mental health treatment.

---

[162] Plaintiffs' Motion, at 36-38.

[163] *Id.*

[164] Admin. Rec., docket no. 51-1, at 74, 117.

[165] Plaintiffs' Motion, at 18; Admin. Rec., docket no. 51-1, at 117.

[166] S.T. v. United, docket no. 52-8, at 7019.

[167] *Id.*

### E.      ORDER

IT IS HEREBY ORDERED that

(1) Plaintiffs' Motion[168] is GRANTED in part and DENIED in part.

(2) United's Motion[169] is GRANTED in part and DENIED in part.

(3) Plaintiffs are entitled to judgment on their ERISA benefits claim for RTC benefits
from December 30, 2017, until January 23, 2018. The amount of such judgment will
be determined through a subsequent motion or trial.

(4) United is entitled to judgment on Plaintiffs' Parity Act claim. The Parity Act claim is
DISMISSED with prejudice.

(5) Within 28 days from the entry of this Memorandum Decision and Order the parties
may file motions directed at the issue of attorney's fees.

(6) This Memorandum Decision and Order shall be filed under seal. However, the sealing
of court documents is highly discouraged. Within 14 days after the entry of this
Memorandum Decision and Order, the parties must meet, confer, and jointly submit a
redacted version of this Memorandum Decision and Order to
dj.nuffer@utd.utcourts.gov for entry on the docket.

IT IS FURTHER ORDERED that the parties must meet, confer, and jointly file within 28
days of the date of after the entry of this Memorandum Decision and Order a report on the status
of this case moving forward, including a proposed briefing schedule on the issues of damages,
prejudgment interest, and attorney's fees and costs. If any of these cannot be resolved by

---

[168] Plaintiffs' Motion, docket no. 49, filed August 24, 2022.

[169] United's Motion, docket no. 47,  filed August 24, 2022.

agreement, motions must be filed within 42 days of the date of after the entry of this

Memorandum Decision and Order.


Signed December 21, 2023.

BY THE COURT

David Nuffer
United States District Judge

United States District Court
for the
District of Utah
December 21, 2023

******MAILING CERTIFICATE OF THE CLERK******

RE:   T. et al v. United Healthcare Insurance et al
      4:21cv21 DN-PK


Brian S. King
BRIAN S KING PC
420 E SOUTH TEMPLE STE 420
SALT LAKE CITY, UT 84111

Scott M. Petersen
FABIAN VANCOTT
95 S STATE ST STE 2300
SALT LAKE CITY, UT 84111-2323

Michael H. Bernstein
ROBINSON & COLE LLC
CHRYSLER E BLDG
666 THIRD AVE 20TH FL
NEW YORK, NY 10017

_____

Aimee Trujillo